IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 20, 2014

## STATE OF TENNESSEE v. WILLIAM EUGENE MCGINNIS, II

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3012     Honorable Seth W. Norman, Judge**

_____

**No. M2013-02515-CCA-R3-CD - Filed November 20, 2014**

_____

Pursuant to a plea agreement, the Defendant, William Eugene McGinnis, II, entered guilty pleas to two counts of aggravated robbery, and the trial court sentenced the Defendant to consecutive eight-year sentences for each count. Subsequently, the Defendant filed a motion to withdraw his guilty pleas, which was denied by the trial court. On appeal, the Defendant argues that the trial court abused its discretion in denying his motion to withdraw his guilty pleas because his pleas were not entered knowingly and voluntarily and because he received ineffective assistance of counsel in connection with the pleas. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and DAVID A. PATTERSON, SP. J., joined.

Joseph L. Morrissey, Jr., Nashville, Tennessee, for the Defendant-Appellant, William Eugene McGinnis, II.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm and Renee Erb, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

On July 1, 2011, the Davidson County Grand Jury indicted the Defendant on three counts of aggravated robbery and two counts of especially aggravated kidnapping. On September 13, 2012, pursuant to a negotiated plea agreement, the Defendant entered guilty pleas to two counts of aggravated robbery, and the State dismissed the kidnapping counts.

At the September 13, 2012 guilty plea hearing, the trial court explained to the Defendant his rights to a trial by jury and the rights he would be giving up by pleading guilty. The court then specifically questioned the Defendant about his mental health and whether he was taking any medication:

COURT:         [Defendant], are you suffering from any mental illnesses that you are aware of?

DEFENDANT:    Yes, sir.

COURT:         Are you taking medication for it?

DEFENDANT:    Not right now, sir.

COURT:         You understand what we're doing here today, do you not?

DEFENDANT:    Yes, sir.

The Defendant also indicated that he was satisfied with the representation provided by his attorneys and that he understood his rights as explained by the court. The court informed the Defendant of the charges against him and the possible sentences on each count, and the Defendant stated that he understood. The Defendant indicated that he had discussed the plea agreement with his attorneys and understood its terms. The State summarized the facts supporting the Defendant's pleas as follows:

> In Count II[,] this matter took place on July [19,] 2011 at the H&H Market here in Davidson County on Centennial Avenue. The two women who worked there, Ms. Dubois . . . and her daughter. . . , were sort of in the back of the store working on stock. The [D]efendant is shown on a videotape entering the store holding a gun down to his side. He goes to where the women are and forces them up to the cash register and steals about $250 out of the cash register and some cigars and then leaves.

> Witnesses who were there saw that there was a white Pontiac at the store. They said they saw him get out of the white Pontiac when he went in there, and . . . the surveillance shows the white Pontiac at the scene at some time near the robbery but it was not as if it was sitting there the whole time.

On Count III the [D]efendant – this matter took place on July [22,] 2011[,] at Rosie's on Charlotte Avenue here in Davidson County. In this matter[,] the [D]efendant was not alone in this episode. He went into the store to buy some cigarettes, and witnesses say he was on his cell phone when he walked out. After that, two other robbers went into the place and robbed the place, put the owner and other staff inside of like a closet or workroom and started shooting at that workroom while those people were still inside of there.

A witness across the street had called about the robbery in progress over there and was able to point out the white Pontiac as it was driving there sort of making the block, the State's theory is to pick up the two robbers. Because the officers were called while the robbery was in progress, they were able to stop that white Pontiac, which also matched the description or was the same one as in the July [19, 2011] case.

Once they had contact with the [D]efendant he made a statement to them confessing that he was the lookout, that he was to receive money for this activity that took place in Rosie's on July [22, 2011], that, in fact, he was the robber[] on July [19, 2011], and he admitted to having walked that same H&H [Market] at another time.

The trial court asked the Defendant whether the facts as recited by the State were true and correct, and the Defendant answered, "Yes, sir." The court then asked, "Do you understand what you're pleading to?" The Defendant responded, "Yes, sir." When asked by the court, "[W]hat is your plea to each [aggravated robbery] count, sir, guilty or not guilty," the Defendant answered, "Guilty." Following the hearing and upon finding that the Defendant's guilty pleas were knowing and voluntary, the trial court accepted the Defendant's guilty pleas. Per the plea agreement, the trial court imposed consecutive eight-year sentences for each count in the Department of Correction.

On October 12, 2012, the Defendant, through subsequent counsel, filed a motion to withdraw his guilty pleas. The motion alleges that his guilty pleas should be set aside to "avoid a manifest injustice" because the pleas were not entered knowingly and voluntarily and because he received ineffective assistance of counsel. The Defendant asserted that he informed counsel that he suffers from "significant . . . mental and cognitive deficiencies," which prevented him from understanding his plea agreement, and that counsel did not seek to have a mental evaluation performed on the Defendant to determine his competency.

Hearings on the Defendant's motion to withdraw his guilty pleas were held on June 21, 2013 and September 6, 2013. At the hearing, the Defendant's mother, Julia Hunter-

McGinnis, testified that the Defendant graduated high school in 2010. He was an average student and graduated on time. Ms. Hunter-McGinnis testified that the Defendant first got into trouble with the law when he was 19 or 20 years old. She maintained that prior to that time, the Defendant had not had "any issues with the law or getting into trouble." Ms. Hunter-McGinnis noted that in 2002, the Defendant had witnessed the deaths of his father and grandfather within the span of a few months. In 2011, the Defendant's grandmother passed away, and the Defendant's trouble with the law began soon after.

Ms. Hunter-McGinnis testified that in November 2010, the Defendant was shot in the back of the head while riding in the car with his brother. He was taken to the hospital and released later that day after doctors removed the bullet. The Defendant lived with Ms. Hunter-McGinnis during this time, and after the incident, she noticed a change in the Defendant's demeanor. He became withdrawn, angered more easily, and failed to maintain his hygiene. Ms. Hunter-McGinnis had to help the Defendant manage his affairs and take him to his doctor's appointments. In February 2012, the Defendant had an encounter with police during which he sustained injuries to his eye and head. He was treated at the hospital after being released from custody on bond. It took the Defendant several months to recover from his injuries, and Ms. Hunter-McGinnis felt that he became more withdrawn and "spiraled down" after the incident.

Ms. Hunter-McGinnis testified that the Defendant first got in trouble with the law in 2012, after the death of his grandmother. The Defendant told Ms. Hunter-McGinnis that "the voices kept telling him to do things," and she asked him to get help and contacted Mental Health Cooperative to get him treatment. He received treatment from Mental Health Cooperative from November 2011 to April 2012, and Ms. Hunter-McGinnis regularly spoke with his caseworker about her concerns. The Defendant was put on medication, but he was still withdrawn and had trouble communicating with his attorneys. Ms. Hunter-McGinnis also believed that the Defendant had difficulty comprehending things. She explained that she would have to repeat herself multiple times to ensure that the Defendant understood what she told him.

Counsel and co-counsel were hired to represent the Defendant in this case, and Ms. Hunter-McGinnis attended some of the meetings between the Defendant and counsel. She reiterated to the Defendant what was discussed during the meetings, but it was difficult to gauge whether he understood what was discussed. She informed counsel of her concerns about the Defendant and gave them "family history, [the Defendant's] mental health history, what was going on with him going to [Mental Health Cooperative], just everything." She emailed counsel after each of the Defendant's medical appointments to convey his diagnosis and medications.

Counsel contacted Ms. Hunter-McGinnis in August 2012 to relay a plea offer from the State for 16 years. Counsel told her not to discuss the plea with the Defendant over the telephone while he was incarcerated, and she did not arrange to meet with the Defendant in person to discuss the plea. Counsel told her that the Defendant did not want to take the plea offer. On the day of the plea hearing, Ms. Hunter-McGinnis was not able to discuss the plea offer with the Defendant. Counsel told her and the Defendant that he had discussed the Defendant's mental health issues with the prosecutor and had "begged and pleaded for him," but the prosecutor would not make a better offer.

On cross-examination, Ms. Hunter-McGinnis acknowledged that the Defendant was arrested in 2009 for possession of a controlled substance and criminal trespass. She also acknowledged that eight months before he was shot, he pleaded guilty to possession of drugs. She stated that the Defendant had a "marijuana problem" prior to being shot and claimed that she did not remember those issues when she previously testified that the Defendant had not been in trouble with the law before being shot. She acknowledged that he received more drug charges in March 2011, and pleaded guilty to unlawful possession of a weapon in August 2012, shortly before pleading guilty in the instant case. Ms. Hunter-McGinnis agreed that the Defendant "has to pay for what he has done," but stated that he is sick and needs help. She explained that the Defendant is bipolar and suffers from major depressive disorder and post-traumatic stress disorder.

Deandrea Dillard, the Defendant's case manager at Mental Health Cooperative, testified that she worked with the Defendant for six months, meeting with him during home visits once per month. Ms. Hunter-McGinnis was Ms. Dillard's main contact, and she usually spoke with Ms. Hunter-McGinnis before meeting with the Defendant. Each visits lasted approximately 15 minutes. The Defendant was very "quiet and polite," but Ms. Dillard's main source of information was Ms. Hunter-McGinnis.

Counsel testified that he had practiced law for 35 years and had tried over 200 felony cases during his career. He stated that it is not uncommon to have clients with various mental issues, and he had tried cases that involved clients with serious mental health issues. Counsel was hired to represent the Defendant in the instant case and stated that he has known the Defendant "for years" because he represented him on prior criminal charges. He agreed that the Defendant had mental issues as a result of being shot and allegedly beaten by police. He stated, however, that one of the Defendant's major problems was "[a] mother who wouldn't let him grow up[.]". He encouraged Ms. Hunter-McGinnis to "let [the Defendant] grow up" and "accept responsibility for some of the conduct he has been involved in."

Counsel obtained the Defendant's mental health records from the Criminal Justice Center and spoke with Jeff Blum, the mental health coordinator at the Davidson County

Sheriff's Department, about the Defendant's issues. He was also aware that the Defendant had worked with the Mental Health Cooperative and discussed with Ms. Hunter-McGinnis his mental issues. Counsel determined that pleading guilty by reason of insanity was not a viable defense in the Defendant's case. Based on counsel's conversations with the Defendant, his statement to police, and his medical records, counsel "did not see any basis for [pleading not guilty by reason of insanity]." Counsel watched the videotape of the Defendant's statement to police and opined that the Defendant looked "scared" but "coherent" and "competent" to engage in a conversation with police. Additionally, counsel recalled that the Defendant wrote letters to the judge, his attorneys, and his mother, and opined that these letters established the Defendant's competency because he discussed plea negotiations in the letters.

Counsel showed the Defendant's mental health records to the prosecutor and argued that mitigation should apply. He recalled that the prosecutor made a plea offer that was less than what she originally indicated she thought the case was worth. Counsel noted that the plea agreement dismissed the kidnapping charges and opined that had the Defendant been convicted at trial, he likely would have received a sentence of 30 years or more. Counsel reviewed the plea agreement with the Defendant in great detail and believed that the Defendant understood its terms. Counsel reiterated that he "had no doubt" that the Defendant knew what armed robbery was and what the State would have to prove to convict him.

Counsel recalled that in 2011, the Defendant agreed to work with detectives as a confidential informant in an unrelated murder investigation; however, he backed out the day that he was scheduled to wear a wire during a meeting with the suspect in that case. Counsel stated that the Defendant understood that his assistance to police could positively affect his case; however, he decided not to participate for fear of retaliation. Counsel stated that he "begged" and "did every persuasive thing [he] knew to do" to convince the prosecutor to give the Defendant less time, but given the strength of the State's case, he believed the plea offer was the best he could do. Counsel opined that the Defendant entered a guilty plea and accepted an effective sentence of 16 years to avoid greater punishment. Counsel agreed that at the time of his plea, the Defendant had previously pleaded guilty in two other cases.

On cross-examination, counsel recalled that Ms. Hunter-McGinnis expressed her concerns about the Defendant's mental health to him. Counsel and co-counsel met with the Defendant at the prison prior to his pleading guilty and explained the plea agreement to him. Counsel acknowledged that the Defendant informed him that he was not getting his medication in prison. Counsel immediately contacted Mr. Blum to check into the Defendant's claims. Counsel had "no doubts" that the Defendant understood what he was doing when he pleaded guilty. Counsel agreed that he did not have any other mental

evaluations conducted on the Defendant and stated, "This was not a case where an insanity defense was supported . . . and I had no doubt whatsoever that [the Defendant] was competent."

Co-counsel testified that she participated in the representation of the Defendant in his previous cases and in the instant case. She obtained the Defendant's mental health records from Mr. Blum and spoke with Ms. Hunter-McGinnis about the Defendant's prior mental health issues. She testified that she and counsel had discussed with the Defendant his rights to a trial by jury and the risks of trial "from the very beginning on the very first gun charge." She believed that the Defendant understood his rights and the rights he would be waiving by pleading guilty.

On cross-examination, co-counsel acknowledged that the Defendant did not want "serious jail time," but stated that because of the strength of the State's case, they were concerned he would be looking at significantly more time if he went to trial. She agreed that Ms. Hunter-McGinnis shared her concerns about the Defendant's mental health issues with her but stated, "[I]n all of my dealings with [the Defendant] he was coherent." She acknowledged that the Defendant told the trial court that he was not taking his medications on the day of his guilty plea hearing; however, she stated, "In speaking with him I believe it was clear and he understood what we were doing that day and he wanted to go ahead and go forward with the deal." She stated that she would have had the Defendant evaluated if it would have been useful, but she believed it would have been a waste of time. She explained,"I spent a lot of time talking to him, and he understood the nature of what we were looking at."

Following the hearing, the trial court took the matter under advisement and issued an order denying relief on October 9, 2013. The court acknowledged the mental health issues raised by the Defendant but accredited the testimony of counsel and co-counsel, both of whom testified that the Defendant understood his rights and the terms of his guilty plea agreement. The court reasoned and concluded, in part, as follows:

> Considering all of the proof adduced at the hearing in this matter, the Court believes that the Defendant has failed to show that any manifest injustice exists which would grant him relief. It appears that counsel was thorough and competent in representing the Defendant, who was aware of all of the ramifications of entering the guilty plea. Due to the weight of the evidence against him, the likelihood of conviction if tried by a jury would have been very high and the consequences would have been much worse had the Defendant not accepted the plea offer.

It is from this order that the Defendant now appeals.

## ANALYSIS

On appeal, the Defendant argues that the trial court erred in denying his motion to withdraw his guilty pleas because his pleas were not knowingly and voluntarily entered and because he received ineffective assistance of counsel in connection with the entry of his pleas. The State responds that the trial court properly denied relief because the Defendant failed to establish a manifest injustice necessitating withdrawal of his guilty pleas. Upon review, we agree with the State.

Although not raised by either party, we must begin by noting that the Defendant failed to file a timely notice of appeal in this case. Tennessee Rule of Appellate Procedure 4(a) states that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from . . . ." However, this rule also states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). This court, in deciding whether to grant a waiver regarding an untimely notice of appeal, "shall consider the nature of the issues for review, the reasons for the delay in seeking relief, and other relevant factors presented in each case." Michelle Pierre Hill v. State, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn. Crim. App., at Nashville, Feb. 13, 1996), perm. app. denied (Tenn. May 28, 1996). "Waiver is not automatic and should only occur when 'the interest of justice' mandates waiver. If this court were to summarily grant a waiver whenever confronted with untimely notices, the thirty-day requirement of Tennessee Rule of Appellate Procedure 4(a) would be rendered a legal fiction." State v. Rockwell, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (citing Michelle Pierre Hill, 1996 WL 63950, at *1).

Here, the Defendant filed a notice of appeal on November 12, 2013, thirty-four days after the trial court entered its order denying the Defendant's motion to withdraw his guilty plea. Accordingly, his notice of appeal was untimely by four days, and the Defendant failed to provide an explanation for his untimely filing. However, given that the notice of appeal was untimely by only four days, we conclude that the "interest of justice" is best served by granting a waiver in this case. See Tenn. R. App. P. 4(a); see also Crittenden v. State, 978 S.W.2d 929, 932 (Tenn. 1998). Thus, we turn to address the Defendant's claims.

This court reviews a trial court's decision regarding a motion to withdraw a guilty plea for an abuse of discretion. State v. Crowe, 168 S.W.3d 731, 740 (Tenn. 2005); State v. Turner, 919 S.W.2d 346, 355 (Tenn. Crim. App. 1995). "An abuse of discretion exists if the

record lacks substantial evidence to support the trial court's conclusion." Crowe, 168 S.W.3d at 740 (citing Goosby v. State, 917 S.W.2d 700, 705 (Tenn. Crim. App. 1995)).

Tennessee Rule of Criminal Procedure 32(f) provides:

Withdrawal of Guilty Plea.

(1) Before Sentence Imposed.–Before sentence is imposed, the court may grant a motion to withdraw a guilty plea for any fair and just reason.

(2) After Sentence But Before Judgment Final. –After sentence is imposed but before the judgment becomes final, the court may set aside the judgment of conviction and permit the defendant to withdraw the plea to correct manifest injustice.

Tenn. R. Crim. P. 32(f) (emphases added).

Here, the Defendant's judgments were entered on September 13, 2012, and he filed his motion to withdraw his pleas on October 12, 2012. "As a general rule, a trial court's judgment becomes final thirty days after its entry unless a timely notice of appeal or a specified post-trial motion is filed." State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996) (citing Tenn. R. App. P. 4(a) and (c); State v. Moore, 814 S.W.2d 381, 382 (Tenn. Crim. App. 1991)). Because the Defendant filed his motion to set aside his pleas after his sentence was imposed but before the judgments became final, the more demanding standard, "to correct manifest injustice," applies to our review of the trial court's denial of the motion. See Tenn. R. Crim. P. 32(f); Crowe, 168 S.W.3d at 741. "This standard is based 'upon practical considerations important to the proper administration of justice.'" Crowe, 168 S.W.3d at 741 (quoting Kadwell v. United States, 315 F.2d 667, 670 (9th Cir. 1963)). This court has outlined certain circumstances that warrant the withdrawal of a guilty plea under the manifest injustice standard:

Although Rule 32(f) does not define "manifest injustice," courts have identified on a case-by-case basis circumstances that meet the manifest injustice standard necessary for withdrawal of a plea. See Turner, 919 S.W.2d at 355; [State v.] Evans, 454 S.E.2d [468,] 473 [(Ga. 1995)]. Withdrawal to correct manifest injustice is warranted where: (1) the plea "was entered through a misunderstanding as to its effect, or through fear and fraud, or where it was not made voluntarily"; (2) the prosecution failed to disclose exculpatory evidence as required by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and this failure to disclose influenced the entry of the

plea; (3) the plea was not knowingly, voluntarily, and understandingly entered; and (4) the defendant was denied the effective assistance of counsel in connection with the entry of the plea.

Crowe, 168 S.W.3d at 741-42 (internal footnotes omitted); accord State v. Virgil, 256 S.W.3d 235, 240 (Tenn. Crim. App. 2008). The defendant bears the burden of establishing that his or her plea should be withdrawn to correct manifest injustice. Turner, 919 S.W.2d at 355 (citation omitted).

We note that "[a] defendant does not have a unilateral right to withdraw a plea." Crowe, 168 S.W.3d at 740 (citing State v. Mellon, 118 S.W.3d 340, 345 (Tenn. 2003); Turner, 919 S.W.2d at 355; State v. Anderson, 645 S.W.2d 251, 253-54 (Tenn. Crim. App. 1982)). Moreover, "a defendant's change of heart about pleading guilty or a defendant's dissatisfaction with the punishment ultimately imposed does not constitute manifest injustice warranting withdrawal." Id. at 743 (citing Turner, 919 S.W.2d at 355).

When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligently made. Id. These factors include the following:

the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him;

the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

In the present case, the Petitioner first argues that his pleas were not knowingly, voluntarily, and understandingly entered. He avers that his mental health issues combined with the fact that he was not taking his medication on the day of his guilty plea hearing rendered his guilty plea unknowing and involuntary. He correctly acknowledges that a defendant's "bare allegations, unsupported by medical testimony, about the use of psychiatric drugs [is] insufficient to support a claim that his guilty plea was not knowingly and voluntarily entered." Darrell Wayne Bumpus v. State, No. M2010-00222-CCA-R3-PC, 2010 WL 5140673, at *8 (Tenn. Crim. App. Dec. 14, 2010) (citations omitted). He maintains, however, that his medical records, which were introduced into evidence at the hearing on his motion to withdraw his guilty pleas, establish that he was suffering from several mental health disorders and was prescribed medication to treat these disorders at the time of his guilty pleas. While such records were introduced, we conclude that the Defendant has still failed to establish that his pleas were not knowingly and voluntarily entered.

At the guilty plea hearing, the trial court specifically inquired into the Defendant's mental health and medication. The Defendant acknowledged that he suffered from mental illness and was not currently taking his prescribed medication. He assured the court, however, that he understood "what we are doing here today." Counsel and co-counsel also testified that although the Defendant was not taking his medication on the day of the plea, they had "no doubts" that he understood what he was doing and wanted to enter the guilty pleas. Indeed, the Defendant's medical records establish that he suffered from mental health disorders and was prescribed medication for those disorders; however, the Defendant presented no medical testimony about his medication and what affect not having his medication would have upon him. See Darrell Wayne Bumpus, 2010 WL 5140673, at *8 (concluding that the petitioner failed to establish his that pleas were not knowing and voluntary where he did not present medical testimony about the use of his prescribed medication and what effect not having this medication would have upon him); Bobby Rayle v. State, No. E2006-01366-CCA-R3-PC, 2007 WL 1966021, at *4 (Tenn. Crim. App. July 9, 2007), perm. app. denied (Tenn. Oct. 15, 2007) (concluding that the petitioner failed to establish his pleas were not knowing and voluntary despite evidence that he was under the influence of prescription medication at the time of his guilty plea because he presented no expert testimony regarding the effects of the medication and his guilty plea hearing testimony indicated an understanding of all questions asked). The trial court noted that counsel drafted a detailed plea petition, which was signed by the Defendant prior to the hearing, that set forth

all of the terms of the Defendant's plea agreement as well as the Defendant's rights and potential penalties if he had proceeded to trial. The court also noted that the Defendant was familiar with criminal proceedings and had entered guilty pleas in several previous cases. During the plea colloquy, the Defendant indicated an understanding of the proceeding and answered all questions appropriately. The trial court was satisfied that the Defendant's pleas were voluntarily and knowingly entered. The record supports the conclusion of the trial court. Accordingly, we discern no abuse of discretion.

The Defendant also argues that he received ineffective assistance of counsel in connection with his pleas, and therefore, withdrawal is warranted to prevent manifest injustice. He premises his argument upon counsels' failure to request a continuance at the guilty plea hearing to allow him to take his medication before pleading "so [the Defendant] could knowingly, voluntarily, and understandingly enter into a plea with the assistance of the medications that had been prescribed." We begin by noting that although ineffective assistance of counsel claims may be raised on direct appeal, this court has cautioned time and time again that this is a practice "'fraught with peril[.]'" State v. Amy Jo Blankenship, No. M2002-01878-CCA-R3-CD, 2004 WL 508500, at *3 (Tenn. Crim. App. Mar. 16 ,2004) (quoting State v. Ricky Brandon, No. M2002-00073-CCA-R3-CD, 2002 WL 31373470, at *2 (Tenn. Crim. App. Oct. 15, 2002); State v. Blackmon, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001), perm. app. denied (Tenn. Oct. 11, 2004)). Further, "once the merits of an ineffective assistance of counsel claim have been addressed on direct appeal, the issue may not be revisited in a post-conviction proceeding." Id. (citing Bobby Allen Joyner v. State, No. 03C01-9807-CR-00260, 1999 WL 3188832, at *2 (Tenn. Crim. App. May 19, 1999), perm. app. denied (Tenn. 1999)).

Like in the post-conviction context, the defendant has the burden of proving ineffective assistance of counsel by clear and convincing evidence. Amy Jo Blankenship, 2004 WL 508500, at *3 (citing State v. Burns, 6 S.W.3d 453, 461 n.5 (Tenn. 1999). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Ineffective assistance of counsel claims are mixed questions of law and fact, and as such, are subject to de novo review. Burns, 6 S.W.3d at 461. However, the trial court's findings of fact are conclusive on appeal unless the evidence in the record preponderates otherwise. Fields v. State, 40 S.W.3d. 450, 456-57 (Tenn. 2001). We will not reweigh or reevaluate this evidence on appeal. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).

In order to prevail on an ineffective assistance of counsel claim, the defendant must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984);

Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697). A defendant successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). In order to satisfy the "prejudice" requirement in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004).

In the present case, we conclude that the Defendant has not proven by clear and convincing evidence that he received ineffective assistance of counsel. As noted earlier, both counsel and co-counsel had previously represented the Defendant in several criminal proceedings and had spent a substantial amount of time with him. They negotiated a favorable plea agreement with the State, prepared a detailed plea petition, and reviewed it with the Defendant prior to the guilty plea hearing. They acknowledged that the Defendant had not taken his medication at the time of the guilty plea hearing, but neither had any concerns about the Defendant's ability to understand the guilty plea proceedings or his desire to plead guilty that day. Further, the Defendant informed the trial court of his mental disorders and that he had not taken his medication that day but assured the court that he understood the proceedings and wished to proceed. See Darrell Wayne Bumpus, 2010 WL 5140673, at *7 (holding that counsel's failure to request a continuance after learning that the defendant had not taken his prescribed medication did not constitute deficient performance where court questioned the defendant and was satisfied that he understood the proceeding despite being off his medication); see also Nichols v. State, 90 S.W.3d 576, 593 (Tenn. 2002) ("[I]t is entirely reasonable for counsel's actions to be influenced by a defendant's own statements.") (citing Strickland, 466 U.S. at 691 (stating that reasonableness of counsel's actions "may be determined or substantially influenced by the defendant's own statements or actions")). Although the Defendant's mother testified that the Defendant told her that he did not want to accept the plea agreement, the trial court implicitly accredited the Defendant's guilty plea testimony over that of Ms. Hunter-McGinnis. Notably, the Defendant did not testify at the hearing on his motion to withdraw his guilty pleas, and nothing in the record dispels the reliability of his guilty plea testimony. Like the trial court,

we agree that counsels' representation was "thorough and competent," and that the Defendant fully understood the ramifications of pleading guilty. We discern no deficient performance by counsel in proceeding with the guilty plea hearing.

Moreover, the Defendant cannot establish prejudice arising from counsels' failure to request a continuance. The gravamen of the Defendant's argument is that counsel's failure to request a continuance prevented him from making a voluntary, knowing, and intelligent decision to enter pleas of guilty because he had not taken his prescribed medication. However, we have already concluded that the Defendant's guilty pleas were entered knowingly, voluntarily, and intelligently despite his lack of medication. The Defendant did not testify at the hearing on the motion to withdraw his guilty pleas and presented no evidence to establish that had counsel requested a continuance, the Defendant would have not pleaded guilty and would have insisted on proceeding to trial. Accordingly, he has failed to establish prejudice resulting from counsels' failure to request a continuance.

The Defendant has not carried his burden of proof to establish a manifest injustice warranting the withdrawal of his pleas. Thus, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to withdraw his guilty pleas.

## CONCLUSION

Based on the foregoing authority and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE